MARGARET KOPP v. TRADERS GATE CITY NATIONAL BANK, a Corporation, Executor of the Estate of JOHN J. O'CONNELL, Deceased, Appellant.—No. 40056.—210 S. W. (2d) 49.

Court en Banc, March 8, 1948.

Rehearing Denied, April 12, 1948.

*Maurice J. O'Sullivan, John J. Killiger, Jr., James P. Alyward, George V. Aylward, Terrence M. O'Brien* and *William B. Teasdale* for appellant.

*C. W. Prince, Wm. Dennis Bush* and *F. Richard Weber* for respondent.

664

[50] VAN OSDOL, C.—Respondent, Margaret Kopp, filed her demand of $28,000 in the Probate Court of Jackson County against the estate of John J. O'Connell, who was respondent's uncle by marriage and who died testate July 24, 1945. The claim or demand was for the reasonable value of services to O'Connell and to his wife (respondent's aunt) during their lives, pursuant to an alleged oral promise by O'Connell and wife that, in consideration of claimant's services, "they would leave her all of their combined estate." The probate court found for claimant-respondent. Upon appeal to and

trial de novo in the Circuit Court of Jackson County, however, a jury returned a verdict for the estate, but the trial (circuit) court granted a new trial on the ground the verdict was against the weight of the evidence. The executor has appealed.

Executor-appellant contends the trial court erred (1) in overruling appellant's motion for a directed verdict at the close of claimant-respondent's evidence because, he urges, there was not sufficient substantial evidence introduced to support respondent's claim; (2) in overruling appellant's motion for a directed verdict at the close of all of the evidence, because, it is said, undisputed and documentary evidence established a release and satisfaction of the claim in full, and (3) in granting the new trial, on the ground the verdict was against the weight of the evidence because, there being no sufficient substantial evidence to support the claim, a verdict for respondent could not be upheld.

In testing the sufficiency of the evidence to make out a case submissible to a jury upon motion for a directed verdict, (as formerly upon a demurrer to the evidence, or a request for a peremptory instruction, now abolished by the Civil Code of Missouri) the plaintiff's evidence must be considered true, and the plaintiff given the benefit of every inference of fact which can be reasonably drawn therefrom. Lowry v. Mohn, Mo. Sup., 195 S. W. 2d 652; see also Chandler v. Hulen, 335 Mo. 167, 71 S. W. 2d 752. The evidence being so considered the question is—was there sufficient substantial evidence introduced supporting plaintiff's claim? Likewise, when a motion for a new trial is sustained on the ground the verdict is against the weight of the evidence, the appellate court will determine whether or not there was sufficient substantial evidence to sustain a verdict for the party to whom the new trial was granted. Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. 2d 297, and cases therein cited.

[51] In the instant case appellant contends and respondent concedes a family relation existed between the O'Connells and respondent. Where a family relation exists between a person rendering services (such as are in question in the instant case) and the recipient thereof, the rule followed in this state is that no promise or agreement that the services are to be paid for is implied from the mere fact that the services have been rendered and accepted. Prima facie, the presumption is that such services are rendered gratuitously, casting upon the party claiming compensation therefor the burden of rebutting the presumption. In overcoming the presumption, the claimant must prove either by direct testimony or by evidence from which it may be reasonably inferred that there was an agreement or mutual understanding the claimant was to be remunerated for the services rendered. Chandler v. Hulen, supra; Liebaart v. Hoehle's Estate, Mo. App., 111 S. W. 2d 925; Baker v. Lyell, 210 Mo. App. 230, 242

S. W. 703, and cases therein cited. While mere expressions of gratitude or intended generosity on the part of the recipient are not alone sufficient (Woods v. Land, 30 Mo. App. 176), the promise to pay may be implied from any facts or circumstances which in their nature justify the inference of an actual contract of hire or an actual understanding between the parties to that effect. Chandler v. Hulen, supra; Brown v. Holman, 292 Mo. 641, 238 S. W. 1065; Cowell v. Roberts' Executor, 79 Mo. 218, and cases therein cited.

John J. O'Connell married respondent's aunt, Margaret Christopher, in 1909. Mrs. Kopp (Mrs. O'Connell's sister) had died in 1897, at which time respondent and her brother, Harry Kopp, were respectively thirteen months and two years old. In 1905, Mrs. O'Connell, then Margaret Christopher, had become guardian of the infants' estate consisting of real estate in Kansas yielding an annual income of about $175. The land had been devised to the children by their grandmother Christopher, who died in 1905. The children both resided in the O'Connell home from the time of the O'Connell marriage until Harry left in 1916. Respondent, however, continued to live with the O'Connells. She attended St. Aloysius School, Kansas City, and Manual Training High School for a year. It could be inferred she had contemplated further study in "Brown's Business College." The evidence shows there was great devotion between the O'Connells and Margaret. John J. O'Connell was the owner of and received income principally from the rental of real estate. It is undisputed that respondent rendered valuable services to the O'Connells, the nature of which was described by many witnesses. She "kept house" (the house was "immaculate"), cooked, washed, ironed, mowed the lawn, shoveled snow, cleaned the furnace, drove the family car, (Mr. O'Connell did not drive an automobile), accompanied and assisted Mr. O'Connell in collecting rent, prepared his income tax returns, supervised the repair of the rental properties, sometimes personally delivered lumber and roofing materials to workmen engaged in repairing the properties, and on some emergency occasions cleaned sewer drains of various rented apartments. Mr. O'Connell's hearing had become defective during several years preceding his death; and respondent's tasks became more and more onerous because of the declining health which attended the latter months of the lives of both Mr. and Mrs. O'Connell.

Respondent's brother, Harry, testified of a conversation with Mr. O'Connell in 1914, "I just told him that he was working Margaret too hard and he said that she wouldn't be sorry because at the end of the death she would get the estate, and he said, 'She is only taking care of her own stuff.' . . . Sitting at the supper table (Margaret, Mr. O'Connell, Mrs. O'Connell and the witness were present) Mr. O'Connell said that he and Mrs. O'Connell had made an agreement that afternoon with Margaret if she wouldn't go to school and stay

there and take care of them, at their death they would leave their property to her." A witness, Aurora Segura, formerly a tenant of Mr. O'Connell, testified, "We, you know, asked him why hadn't Margaret gotten married all these years and he used to tell us that he had promised her that if she would stay with him all these years until they both died that she would get [52] everything they had." Several witnesses testified Mr. and Mrs. O'Connell had expressed their gratitude and intended benefaction in language, for example, "I don't know what in the world I would do without Margaret", and "Margaret would be well taken care of." John J. O'Connell, by his will, and codicil thereto, bequeathed respondent $750, residue to testator's four sisters, "or to the survivor or survivors of them, in equal parts." Respondent renounced the bequest.

In our view, the facts and circumstances related supra are substantial and supportive of an agreement or mutual understanding that respondent was to be remunerated for services rendered; indeed, the declarations of Mr. O'Connell in the presence of respondent's brother were sufficiently substantial, if given credence, in proving an express oral agreement to that effect. It would seem reasonable to infer respondent would not have foregone her plans for further study and her contemplated business career and would not have stayed on through the subsequent 31 years performing the many, varied and onerous services detailed in evidence, unless she understood she would be compensated. It would seem reasonable to infer the O'Connells would not have expected respondent to stay on and would not have accepted the service rendered absent their intention that respondent should be rewarded. As stated, they frequently said in effect "Margaret will be well taken care of." The testimony of the witness, Aurora Segura, detailing Mr. O'Connell's declaration, that he had promised respondent "that she would get everything they had" if she would stay on through the years "until they both died", was certainly indicatory of an intention that she would be rewarded, and that he had so promised. If he had so promised it may be readily inferred that respondent continued in the rendition of service understanding she was to be remunerated. In our opinion the evidence we have related, considered as true, is sufficiently substantial in rebutting or overcoming the presumption that the services were rendered gratuitously. If there be shown an agreement or mutual understanding that respondent was to be remunerated and performance of the agreement on her part to be performed, she is not obliged to only pursue a remedy in equity specifically performing the alleged agreement that the O'Connell's should remunerate her by leaving "her all their combined estate"; but she could waive the agreement and, based upon proof of her performance of services and a demonstration of the agreement or mutual understanding rebutting the presumption the services were gratuitous, she may at law recover the reasonable

value of the services rendered. Blackwell v. De Arment's Estate, Mo. App., 300 S. W. 1035; Boldwin v. Lay, Mo. App., 226 S. W. 602; Hall v. Getman, 121 Mo. App. 630, 97 S. W. 607 (in such a case, it is noticed the recovery should not exceed in amount the value of the property promised); Allen v. Allen, 101 Mo. 676, 74 S. W. 396. See also In re Hukreda's Estate, Mo. Sup., 172 S. W. 2d 824. We cannot now follow the language in the opinions in the case of Bircher v. Boemler, 204 Mo. 554, 103 S. W. 40, and in the case of Witte v. Smith, 237 Mo. App. 639, 152 S. W. 2d 661, which seems to limit a claimant's recovery in general assumpsit (in a case where a family relation exists) to a claim based upon an express promise or understanding *to pay claimant during the lifetime of the recipient* of the services performed.

As stated, appellant contends claimant-respondent's recovery is precluded because her claim has been released. June 2, 1943, respondent and her brother signed an instrument denominated "Release and Receipt," as follows:

"We, the undersigned, each assert separate claims against the estate of Margaret O'Connell, deceased, and John J. O'Connell, legal liability for which is denied by him. Said matters have been in controversy and it has been agreed that the sums hereinafter mentioned shall be paid, respectively, to the undersigned in full and final settlement, compromise and release of all claims and demands of every kind and character which we, or either of us, have, can or may have against the estate of said Margaret O'Connell, deceased, or said John J. O'Connell, by reason of any matter, cause or thing whatever arising prior to the date hereof.

[53]"In consideration of the premises and of the sum of $425.35 in hand paid by John J. O'Connell to Harry Kopp, the receipt of which is hereby acknowledged, and of the sum of $319.01 in hand paid by John J. O'Connell to Margaret Kopp, the receipt of which is hereby acknowledged, said parties, and each of them, hereby forever fully release, compromise, settle and discharge any and all claims, demands, actions or causes of action which they, or either of them, have against said John J. O'Connell or the estate of Margaret O'Connell, deceased, by reason of any matter, cause or thing whatever arising prior to the date hereof.

"This receipt and release is contractual in its nature and not a mere recital and the sums paid, respectively, are the sole and only consideration for the execution and delivery hereof.

"In Witness Whereof, the undersigned have executed this release and receipt and each has read and fully understands the same."

Checks of John J. O'Connell dated June 2, 1943 for $435.35 and $319.01 were received and cashed by Harry and respondent, respectively.

It was further shown in evidence that respondent received credits to her account with the First National Bank of amounts of several checks drawn on the account of Mr. O'Connell, each for $25, bearing various dates from April 11, 1944, to June 26, 1945. Ten of the checks bore notations to the effect "in full for all labor—services to date." The checks were in the handwriting of respondent (except the notations mentioned, which were written by another with unsteady hand). The notation now appearing on the check of April 11th, was not made until after the check had been honored and canceled by the drawee bank.

It is urged by appellant the general terms of the release, supra, discharged all claims, matured, future, or contingent, between the parties including, of course, the claim involved herein; that respondent was *sui juris* and executed the release voluntarily, confirming the release by accepting and cashing the $319.01 check having on its face the recitation "In full of claims against maker and estate of Margaret O'Connell"; and that respondent by accepting, endorsing and cashing the various checks, marked in full for labor and services, conclusively effected a satisfaction of, or an estoppel to deny payment for respondent's services.

We observe the language of the instrument, "Release and Receipt," is couched in general terms and is quite comprehensive in embracing all claims, demands or causes of action. It has been written, "While it is settled that where there are general words alone in a release, they shall be taken most strongly against the releasor, yet it is now a general rule in construing releases, especially where the same instrument is to be executed by various persons, standing in various relations and having various kinds of claims and demands against the releasee, that general words, although the most broad and comprehensive, are to be limited to particular demands, where it manifestly appears, by the consideration, by the recital, by the nature and circumstances of the several demands to one or more of which it is proposed to apply the release, that it was so intended to be limited by the parties." 45 Am. Jur., Release, sec. 29, pp. 693-694. See also Bigbee v. Coombs, 64 Mo. 529, and discussion in Grumley v. Webb, 44 Mo. 444, at page 455 et seq.

In view of the general rule so written, some additional evidence will be stated. As we have said Mrs. O'Connell had been guardian of respondent and her brother. The evidence shows that, after respondent and her brother had attained their majority and after Mrs. O'Connell's discharge as guardian, Mrs. O'Connell continued to be a voluntary "depository" of moneys which respondent and her brother from time to time instrusted to her. Mrs. O'Connell kept moneys, documents and memoranda thereof in a safe deposit box. At Mrs. O'Connell's death, an order of the probate court was entered dispensing with administration and authorizing Mr. O'Connell [54]

to take over the assets of her estate. There were found in-Mrs. O'Connell's safe deposit box Certificates of Deposit, U. S. Postal Savings System, in aggregate principal $1850. Memoranda written in the hand of Mrs. O'Connell indicated certificates in the principal sums of $400 and of $300 had been procured by the deposit of moneys, respectively, of Harry Kopp and respondent. Mr. O'Connell's counsel arranged for the payment of the certificates by the postal department, which payment was made June 2, 1943. At the time of payment, interest had accrued on the certificates, which Mrs. O'Connell's memoranda indicated were those of respondent. It was the testimony of Mr. O'Connell's attorney, that he originally prepared the instrument "Release and Receipt," supra, at the direction of Mr. O'Connell, reciting consideration to respondent, $300, to her brother, $400; subsequently and before the instrument was signed, the attorney at Mr. O'Connell's direction changed the respectively stated considerations to $319.01 and $425.35. When respondent signed the instrument at the office of Mr. O'Connell's attorney no mention was made by Mr. O'Connell or his attorney of the claim or claims intended to be released by the instrument; indeed, the attorney testified "he was not curious about what disputes or controversies may have arisen between" the parties; however, he had not "heard any claim of that kind (for services) discussed by them." Respondent's brother testified that he and his sister, respondent, "have a claim' (other than for services) besides this one on trial against the estate."

In view of the several claims, and the two persons variantly claimant; the coincidence of dates of the payment to Mr. O'Connell of the moneys by the postal department, and of the release; the near equality of the considerations $319.01 and $425.35, recited in the release and paid to respondent and to her brother, with the amount of money due upon the postal saving certificates issued upon Mrs. O'Connell's deposit of their funds; and the testimony tending to negative the instant claim for services was even discussed by the parties, when the release was executed, it seems to us it should not be held, as a matter of law, that the parties intended the general terms of the release should apply to the claim involved in the case at bar. It would seem the parties may have had in mind the claims for the proceeds of the postal savings certificates. The circumstances stated make it, at least, doubtful the release was intended to discharge respondent's claim for services, and we believe the question was one for a jury.

Relating to the series of $25 checks—the checks bearing the recitations of full payment for services, quoted supra—respondent's brother testified Mr. O'Connell had stated he gave respondent "checks out there for grocery money." The witness further testified there were no "parking facilities" during banking hours near the drawee bank, and "Mr. O'Connell told me he would go in the bank and make the deposit while Margaret drove around the bank down there

. . ." Respondent urges the inferences that Mr. O'Connell had an opportunity to make and did make the quoted notations without the knowledge of respondent after she had endorsed the checks. Certainly the recitations were not written by respondent to whom Mr. O'Connell had delegated the writing of the checks, and we have noticed the quoted recitation did not appear on the check of April 11th, when the check was presented, paid and canceled. Respondent would not be precluded from recovery upon a theory of satisfaction or estoppel by accepting, endorsing and cashing the checks if when so doing she did not know the checks were made and tendered in payment of services, as recited. The checks (accepted, endorsed and cashed by respondent) were but prima facie evidence of the payment as recited (Gregg v. Roaring Springs Land and Mining Co., 97 Mo. App. 44, 70 S. W. 920); and respondent's evidence tended to rebut the appellant's prima facie showing.

The order granting the new trial should be affirmed.

It is so ordered.

[55] PER CURIAM:—The foregoing opinion by VAN OSDOL, C., in Division One, is adopted as the opinion of the Court en Banc. *Clark, Douglas, Ellison, Hyde, JJ.,* and *Leedy, C. J.,* concur; *Tipton* and *Conkling, JJ.,* dissent.