**William S. MORRIS, Administrator of the Estate of Lee Haynes, Deceased, Appellant,**

v.

**Grayce L. RETZ, Respondent.**

No. 24643.

Kansas City Court of Appeals.

Missouri.

Feb. 6, 1967.

Motion for Rehearing and/or Transfer to Supreme Court April 3, 1966.

Application to Transfer Denied May 8, 1967.

William M. Day, Walter A. Raymond, Raymond, West & Strader, Kansas City, for appellant.

Len L. Balke, Kansas City, for respondent.

BLAIR, Judge.

Grayce L. Retz filed a claim in the Probate Court of Jackson County, Missouri, against the estate of Lee Haynes, deceased, for services rendered him during his lifetime and after trial that court allowed her $7,200.00. William S. Morris, the administrator, appealed this allowance to the circuit court. By stipulation a jury was waived and the cause was submitted to that court on the record of the evidence and the exhibits previously submitted to the probate court. The record consisted solely of the evidence and the exhibits of Grayce L. Retz, for the administrator presented no evidence of any sort in either court. The circuit court rendered judgment for Grayce L. Retz in the sum of $12,500.00. From this judgment the administrator appeals. We

shall refer to the administrator as Morris and to the respondent as Mrs. Retz.

Our duty is to review this action at law upon the law and the evidence as suits of an equitable nature are reviewed by appellate courts. Civil Rule 73.01(d), V.A.M.R. However, as stated, it was submitted to the trial court solely on the record of the evidence and exhibits previously submitted to the probate court. Where a case is submitted to a trial court solely on such evidence, the deference usually accorded to its determination of questions of fact because of its superior opportunity to evaluate the credibility of the witnesses personally appearing before it does not apply for the obvious reason that no witnesses appeared before it and it had no opportunity to evaluate credibility superior to that of the reviewing court. Giokaris v. Kincaid, Mo., 331 S.W.2d 633, 635, 86 A.L.R.2d 925; Temperato v. Horstman, Mo., 321 S.W.2d 657, 661; 3 Mo. Digest, Appeal and Error, Key No. 1008(3).

The claim of Mrs. Retz was in two parts. The first part was for services to Lee Haynes from November 8, 1953 until April 5, 1956. These services consisted of "acting as his cook and housekeeper". They were claimed to be of the reasonable value of $200.00 per month. The second part of her claim was for services to the deceased from April 5, 1956 until his death on November 8, 1963. These services consisted of continuing to act as his cook and housekeeper and acting "as manager of his household and office in his home", "bookkeeper, personal nurse and as office girl and nurse in the practice of his profession". These last services were claimed to be of the reasonable value of $450.00 per month.

Morris contends that the judgment must be reversed because the evidence conclusively shows that Mrs. Retz and the decedent at all pertinent times lived together in a "close and intimate" family relationship and that it must be presumed that the services were intended to be gratuitous in the absence of evidence to the contrary. He asserts that there was no evidence to the contrary. Mrs. Retz counters that Morris failed to plead the existence of a family relationship as a defense and therefore this defense was waived. She cites Muench v. South Side National Bank, Mo., 251 S.W.2d 1, 4. There the defense of family relationship was not pleaded and the court did rule that "such defense is special and affirmative, is in the nature of a confession and avoidance and should have been pleaded, if it were to be relied upon" and denied the defense. Its reliance was on Sec. 509.090, RSMo 1949, now Civil Rule 55.10. That ruling cannot be questioned but it does not apply to this case. The Muench case was a suit on the quantum meruit for services to a decedent filed directly in a circuit court and was controlled by Sec. 509.090, now Civil Rule 55.10. The present case originated in the probate court and is not subject to the Rules of Civil Procedure. The application of those rules is expressly restricted to proceedings of a civil nature in the Supreme Court, Courts of Appeals, Circuits Courts, and Courts of Common Pleas. Civil Rule 41.02; Lenhardt's Estate v. Lenhardt, Mo.App., 322 S.W.2d 170, 173. It has long been the law in this state that formal pleadings are not required in cases originating in a probate court or on appeal therefrom to a circuit court. Cole County v. Dallmeyer, 101 Mo. 57, 13 S.W. 687; Rassieur v. Zimmer, 249 Mo. 175, 155 S.W. 24; Murphy v. Pfeifer, Mo.App., 105 S.W.2d 39, 41; 8 Mo. Digest 2, Courts, Key No. 202(2, 5). Furthermore, the question Morris really raises is that the evidence is insufficient to support the judgment and, since this is a non-jury case, that question may be raised in the appellate court whether or not it was raised in the trial court. Civil Rule 73.01; Lenhardt's Estate v. Lenhardt, supra. The contention is without merit.

We have noticed that all of the evidence in this record was presented by Mrs. Retz and that Morris produced none. She presented ten witnesses. We believe that no

purpose would be accomplished by setting forth individually the testimony of each witness and that generally a summary of their testimony is sufficient for the purposes of this case. On the important features of the case they were not in disagreement. Lee Haynes was a physician. He died November 8, 1963, at the age of 90. We gather from the record that Mrs. Retz and he were neighbors and lived across the street from each other as early as 1942. Whether they were mere acquaintances, friends, or more, or less, while they merely lived as neighbors, the record does not disclose. Prior to 1955, Mrs. Retz was an unlicensed practical nurse and "active" in her profession. Sometime prior to 1952 Doctor Haynes moved his office into his home across the street from the home of Mrs. Retz. Sometime during 1952 Mrs. Retz became the doctor's cook and housekeeper and his "assistant as a nurse, assisting the doctor with patients", working for him only part time. She also worked for others. In 1955 she obtained a state license as a practical nurse and renewed it as required each year and it was still valid at the time of the doctor's death.

In 1956 she moved into the doctor's home. He was then approximately 83 years old. She continued as his housekeeper and cook and became his personal and office nurse on a full time basis. She was "on call" by him at all times seven days a week except for brief absences. If she was briefly absent, she asked a neighbor to look in on him. At first she moved a part of her furniture into his home. During the first two years she was there, she left a part of her furniture in her own home and paid the rent on that home. Then she moved the rest of her furniture to the doctor's home. Whether she furnished a part of the living quarters of the home with her furniture or merely stored it is not established by this record. The doctor's house consisted of two stories. The second story was unfinished. The living quarters were on the first floor. From the time she moved into his home in 1956, she ate her meals there. There were two bedrooms on the first floor. The doctor slept in the "back room" on the first floor and she slept in the "front room" on the same floor in order "to watch the door". She cooked the meals and did the laundry. She took care of the yard. She worked "hard". She did "everything". She accompanied the doctor on calls and "helped to give shots, getting the medicine ready for the patients". Ordinarily he drove to his calls in his automobile and she accompanied him. When he walked to his calls she carried his medicine case for him. In the office she usually wore a nurse's uniform. She answered the telephone, helped with the patients and gave them medicine and shots. The doctor dispensed his own medicines. She assisted him in preparing his prescriptions. She assisted him in getting medicine together for the patients. She assisted him with his instruments. When the drug salesman with whom he dealt about every three weeks called at his office, ordinarily Mrs. Retz and he would check to see what drugs were needed. On infrequent occasions when he was absent from the office and Mrs. Retz was present, if the drug salesman called, she ordered from him what drugs she considered were needed by the doctor. He had given her this authority. On this record there is no question that, in addition to performing her other services, she served the doctor as his constant and regular office nurse during all of the period in question on this appeal. A former president of the Kansas City Chapter of the Professional Association of Licensed Practical Nurses in this state testified that the prevailing rate for a licensed practical nurse was $15.00 per day from 1956 until May 1, 1963 when the rate was elevated to $17.00 per day. These rates were payable to licensed practical nurses living in the home of the employer. The duty of a licensed practical nurse consisted of taking care of the patient, his bedroom and his diet. This duty did not require taking care of the household. This summary is brief but it accurately reflects the evidence relating to the services rendered by Mrs. Retz to the

doctor part time before November 8, 1956, and full time seven days a week continuously from November 8, 1956 to November 8, 1963, when he died following a brief illness.

One witness was asked if she noticed any change in the doctor's condition during the "last year or so" of his life and she answered that she did. There was other testimony that in the "last year or so" of his life he was enfeebled, "failing" and blind in one eye. The witness was asked "Did he require any assistance when he walked?" She answered that he did. She was asked "Did anybody give him that help?" She answered "Yes, Mrs. Retz did. She looked after him all the time. In fact, she treated him as a father." What she meant by her voluntary conclusion that Mrs. Retz treated the doctor as a father during the last year or so of his life was not developed any further by any evidence. No other witness made such a statement.

On August 7, 1963, about ninety days before the doctor's death, he executed a formal document "enumerating furniture and household effects" belonging to Mrs. Retz and then in his home "in order to protect Grayce Retz, who has been my nurse for a long time * * *". This record does not disclose that he ever referred to Mrs. Retz other than as his nurse to anyone.

■■■ We notice that the trial court in a memorandum declared that it was allowing no sum to Mrs. Retz for any services barred by the five year statute of limitations, Sec. 516.120(1), V.A.M.S., and this action of the court is not questioned on this appeal. There is no claim by Morris that the amount allowed is excessive. His single contention is that Mrs. Retz and Doctor Haynes at all pertinent times lived together in a "close and intimate" family relationship and that it must be presumed that her services to him were intended to be gratuitous in the absence of evidence to the contrary and he asserts there was none. There is no question that where services are rendered to each other by members of a family living as one household, they are presumed to be gratuitous. In such a case the law casts upon one claiming compensation the burden of rebutting this presumption. It devolves upon him to prove an agreement to pay for such services either by direct testimony or by facts and circumstances sufficient to justify a finding that there was a mutual understanding and intention to that effect. Morris cites many decisions declaring this to be the rule and it is the rule beyond all doubt. Our appellate decisions to this effect are numerous and unvarying. 13 Mo. Digest, Executors & Admr., Key No. 221(2).

■■■ For a family relationship to exist between persons residing under the same roof neither kinship in any degree nor illicit cohabitation between a man and a woman not married is essential. Such relationship can exist without either. Wells v. Goff, 361 Mo. 1188, 239 S.W.2d 301, 303–304; Manning v. Driscoll's Estate, Mo. App., 174 S.W.2d 921, 922; Brunnert v. Boeckmann's Estate, Mo.App., 258 S.W. 768, 770; Birch v. Birch, 112 Mo.App. 157, 86 S.W. 1106, 1108. Yet the mere circumstance that two or more persons reside in the same home does not, standing alone, establish a family relationship. For a concept that it did would force an anomalous and wholly illogical result. Every person residing in a home, roomers and boarders, domestic servants, and nurses caring for patients, would be regarded as bearing a family relationship to the head of the home and the members of his family. There must be more than mere residence under the same roof to establish a family relationship and that relationship must be established by evidence before there can be any presumption that services rendered are intended to be gratuitous. Birch v. Birch, 112 Mo.App. 157, 86 S.W. 1106, 1108.

■■■ On the other hand, one who bears no family relationship to the person to whom he renders services is not presumed to have rendered those services gratuitously, unless contrary evidence con-

vinces that the services were actually intended to be gratuitous. Quite the contrary, the law declares, in such circumstances, that the mere rendering of the services implies a contract to pay and the burden rests on the party who accepts the services to prove that they were rendered gratuitously. Lauf v. Wiegersen, Mo.App., 297 S.W. 79, 82; Aldridge v. Shelton's Estate, Mo.App., 86 S.W.2d 395; Murphy v. Pfeifer, Mo.App., 105 S.W.2d 39, 42; Manning v. Driscoll's Estate, Mo.App., 174 S.W.2d 921, 923; Taylor v. Currie's Estate, Mo.App., 83 S.W.2d 194, 197; Smith v. Davis' Estate, 206 Mo.App. 446, 230 S.W. 670, 673; Offord v. Jenner's Estate, Mo. App., 189 S.W.2d 173, 176; Steva v. Steva, Mo., 332 S.W.2d 924, 927.

The term "family", as employed in the family relationship rule, is defined as a collective body of persons under one head and one domestic government, "who have reciprocal, natural, or moral duties to support and care for each other." Offord v. Jenner's Estate, Mo.App., 189 S.W.2d 173, 176.; Steva v. Steva, Mo., 332 S.W.2d 924, 926; In re Estate of Fox, Mo.App., 368 S. W.2d 909; Sevier v. Staples' Estate, Mo. App., 309 S.W.2d 706, 708; Dalton v. Poinsett, Mo.App., 164 S.W.2d 124, 128; Manning v. Driscoll's Estate, Mo.App., 174 S.W.2d 921, 923; Wood v. Lewis' Estate, 183 Mo.App. 553, 167 S.W. 666, 669.

The situation of Mrs. Retz and Doctor Haynes and their relation to each other at the time her services were rendered must determine the question whether there was a family relationship. Lauf v. Wiegersen, Mo.App., 297 S.W. 79, 82. As we have observed, before Mrs. Retz began work for the doctor part time and while they were merely neighbors, there is no evidence from which we can determine whether they were acquaintances, friends, or more, or less. After she began working for the doctor part time there is no evidence of any relationship other than that between one person rendering services to another who accepts them. After she began resid-

ing in his home and acting as his cook and housekeeper and his personal and office nurse in 1956, there is no evidence of any legally significant difference in their relationship. There is no evidence of any word either spoke to the other. There is no evidence to indicate how they conducted themselves toward each other when she was not performing the services she rendered and when the doctor was not immediately engaged in the practice of his profession. There is no evidence that they spent their leisure time together in the home or had any social life together outside the home. There is no evidence that they had any mutual friends who were entertained in the home and none that Mrs. Retz ever entertained her own friends in the home. There is no evidence that they ever went anywhere together except when she accompanied the doctor on professional calls or took him for walks in the last years of his life when he was enfeebled, "failing" and half blind. There is no evidence that either described the relationship to any other person except that the doctor, about ninety days before his death, in a formal document "enumerating furniture and household effects" belonging to her described her as his "nurse". There is evidence that he furnished her with room and board and that he allowed her to bring her furniture into his house. The evidence does not disclose whether she used her furniture in his home or merely stored it. Even if she used it, this is a far call from establishing that she and the doctor lived in a family relationship. It is far from uncommon for women who take up a permanent residence in another's home to want at least some of their own furniture. That he furnished her with room and board is what reasonable men would expect of him since he held her on call twenty-four hours a day seven days a week to serve him as a cook, housekeeper and as a personal and office nurse.

There is no explanation why Mrs. Retz would sacrifice her "active" practice of her profession as a licensed

**550**

practical nurse, able to earn $15.00–$17.00 per day for rendering lesser services to others, to serve Doctor Haynes on call around the clock seven days a week for no compensation except her board and room. To argue on this record that she did so is totally unreasonable. Concerning the statement of the one witness who volunteered the conclusion that Mrs. Retz treated the doctor "as a father" without any development of the grounds for her conclusions, we can only regard what she says as descriptive of the conduct of a compassionate and kindly nurse toward an aged man, enfeebled and failing and half blind in the last years of his life. This conclusion alone, or coupled with all of the evidence, is a reed too slender for us to lean against it a ruling that a family relationship existed between the doctor and Mrs. Retz. Finally, there is a total absence of evidence, direct or circumstantial, that she and the doctor had any "reciprocal, natural or moral duties to support and care for each other" as members of one family. This is the true touchstone and, therefore, for this reason, as well as all of the other reasons we have recited, this record does not establish the existence of any family relationship. The relationship was simply that existing between two persons, one rendering services and the other accepting them, and the mere rendering of those services by Mrs. Retz and the acceptance of them by the doctor implied a contract to pay. In these circumstances, the burden rested on Morris to prove that the services were rendered gratuitously if that was a fact. This he wholly failed to do.

He cites eleven typical decisions applying the family relationship rule.[1] The rule announced by these decisions and the results they reached cannot be questioned. In each a family relationship was established by evidence meeting the requirements of the rule. They do not parallel the facts of this case where there is no evidence to establish a family relationship.

We have reviewed this cause de novo on the law and the evidence in accordance with the requirements of Rule 73.01(d), as they apply on this appeal, and we hold that the judgment of the trial court is in accordance with our own determinations of fact and conclusions of law and that it was for the right party. It is affirmed.

All concur.

---

1. Wells v. Goff, 361 Mo. 1188, 239 S.W. 2d 301; In re Estate of Fox, Mo.App., 368 S.W.2d 909, 913; Steva v. Steva, Mo., 332 S.W.2d 924, 926; Hyde v. Honiter, 175 Mo.App. 583, 158 S.W. 83, 87; Taylor v. Currie's Estate, Mo. App., 83 S.W.2d 194, 197; Broyles v. Byrne, Mo.App., 13 S.W.2d 560; Wood v. Lewis' Estate, 183 Mo.App. 553, 167 S.W. 666; Manning v. Driscoll's Estate, Mo.App., 174 S.W.2d 921, 924; Dalton v. Poinsett, Mo.App., 164 S.W.2d 124, 128; Farris v. Faris' Estate, Mo.App., 212 S.W.2d 71, 75; Trantham v. Gullic, Mo.App., 201 S.W.2d 522, 527.